## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JEFFSON ST-HILAIRE, | ) | |
| MERLANGE MEME, | ) | |
| EVENKS MEME, | ) | |
| NADEGE JEAN MARIE, | ) | |
| L.M.D.M. by her next friend Martin Welp, on their | ) | |
| own behalf and on behalf of a class of those | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-01505-TWP-TAB |
| | ) | |
| COMMISSIONER OF THE INDIANA BUREAU | ) | |
| OF MOTOR VEHICLES, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

In a perhaps historic move for the State of Indiana, House Enrolled Act 1050 ("H.E.A. 1050") created a pathway for humanitarian parolees to receive driver's licenses, permits, and identification cards, as well as registrations and certificates of title for their motor vehicles. *See* 2023 Ind. Legis. Serv. P.L. 211-2023, Section 20 (May 4, 2023) (currently codified at Ind. Code § 9-13-2-3.5). By the same stroke, however, H.E.A. 1050 bestowed these credentials — without which the fundamentally important ability to drive is prohibited — only to a certain subset, or classification, of parolees: citizens, nationals, or habitual residents of Ukraine. *See* 2023 Ind. Legis. Serv. P.L. 211-2023, Section 17 (currently codified at Ind. Code § 9-13-2-121.5).

Plaintiffs Jeffson St-Hilaire, Merlange and Evenks Meme, Nadege Jean Marie, and L.M.D.M., by her next friend Martin Welp (collectively, "Haitian Humanitarian Parolees" or "Plaintiffs"), on their own behalf and on behalf of those similarly situated, contend that H.E.A. 1050 runs afoul of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*. ("Title VI")

and the Equal Protection Clause of the Fourteenth Amendment ("Equal Protection Clause") and is preempted by federal law. The Haitian Humanitarian Parolees initiated this lawsuit against Defendant Commissioner of the Indiana Bureau of Motor Vehicles (the "Commissioner" or the "BMV") seeking declaratory and injunctive relief, and a preliminary injunction enjoining certain portions of the definitional provision of Ind. Code § 9-13-2-121.5, and requiring the BMV to continue enforcing the substantive provisions of Ind. Code § 9-13-2-3.5. Oral arguments were heard on November 17, 2023, and the Court thanks counsel for their advocacy.

For the reasons that follow, the Court determines the Haitian Humanitarian Parolees have a strong likelihood of success on their challenge to the statute, have no adequate remedy at law, and face irreparable harm if the Commissioner is not enjoined. In addition, the balance of harms and the public interests favors the Haitian Humanitarian Parolees. Accordingly, preliminary injunctive relief is **granted**.

## I.   BACKGROUND

### A.   Indiana's H.E.A. 1050

Indiana's Governor signed H.E.A. 1050 into law on May 4, 2023, and it took immediate effect. Section 20 of H.E.A. 1050, codified at Indiana Code § 9-14-8-3.5, provides as follows:

> The bureau of motor vehicles shall adopt rules under IC 4-22-2, including emergency rules in the manner provided under IC 4-22-2-37.1, necessary to implement the issuance and administration of the following:
>
> (1) Driver's licenses, permits, or identification cards for individuals granted parole.
>
> (2) Registration and certificates of title for motor vehicles of individuals granted parole.

Section 14 of H.E.A. 1050, adds to the definition of "Indiana resident",[1] codified at Indiana Code § 9-13-2-78, any person "who is living in Indiana and has been granted parole."

Haitian Humanitarian Parolees take issue, however, not with Sections 20 or 14, but with Section 17 of H.E.A. 1050 ("Section 17").  Indiana Code § 9-13-2-121.5, Section 17 states:

"Parole" means temporary legal presence in the United States under 8 U.S.C. 1182(d)(5) granted to an individual who:

(1) is a citizen or national of Ukraine or last was a habitual resident of Ukraine; and

(2) meets the criteria established under Section 401(a) of the Additional Ukraine Supplemental Appropriations Act ["AUSAA"] (Public Law 117–128) as in effect on January 1, 2023.[2]

---

[1] One must be an "Indiana resident" to receive a driver's license, learner's permit, or identification card.  *See* 140 Ind. Admin. Code 7-1.1-3(a).

[2] Section 401(a) of the AUSAA establishes Ukrainians' eligibility for certain federal assistance benefits under certain conditions. *See* Pub. L. No. 117-128, § 401(a), 136 Stat. 1211, 1218 (2022).  In full, it states:

(a) IN GENERAL.—Notwithstanding any other provision of law, a citizen or national of Ukraine (or a person who last habitually resided in Ukraine) shall be eligible for the benefits described in subsection (b) if—

(1) such individual completed security and law enforcement background checks to the satisfaction of the Secretary of Homeland Security and was subsequently—

(A) paroled into the United States between February 24, 2022 and September 30, 2023; or

(B) paroled into the United States after September 30, 2023 and—

(i) is the spouse or child of an individual described in subparagraph (A); or

(ii) is the parent, legal guardian, or primary caregiver of an individual described in subparagraph (A) who is determined to be an unaccompanied child under section 462(g)(2) of the Homeland Security Act of 2002 (6 U.S.C. 279(g)(2)) or section 412(d)(2)(B) of the Immigration and Nationality Act (8 U.S.C. 1522(d)(2)(B)); and

(2) such individual's parole has not been terminated by the Secretary of Homeland Security.

Consistent with its duties under Section 20 of H.E.A. 1050, upon passage the BMV promptly issued an emergency rule mirroring the statute's requirements, which allows non-citizens who "hav[e] been granted parole as defined in IC 9-13-2-121.5" to obtain a driver's license, learner's permit, or identification card and to register or title a motor vehicle (LSA Document #23-365(E), Filing No. 1-1).  This emergency rule has since been converted to a Final Rule (*see* Filing No. 37-6), which amended the relevant Indiana Administrative Code sections.  *See, e.g.*, 140 Ind. Admin. Code 6-1-2 (Application for Title).

H.E.A. 1050 altered the landscape for Indiana driver's licenses in another relevant way.  By way of background, over sixteen years ago, in 2007, the Indiana General Assembly passed legislation, Public Law 184-2007, requiring license and permit applicants "to present to the [BMV] valid documentary evidence" that the applicant met one of several "lawful status" categories.  *See* 2007 Ind. Legis. Serv. P.L. 184-2007, Section 35 (July 1, 2007) (West) (currently codified as amended at Ind. Code § 9-24-9-2.5).  The same requirement was made of non-driving applicants seeking identification cards.  *See* 2007 Ind. Legis. Serv. P.L. 184-2007, Section 50 (July 1, 2007) (West) (currently codified as amended at Ind. Code § 9-24-16-3.5).  After passage of the 2007 legislation, the BMV promulgated rules requiring that applications to title a vehicle include proof of lawful status.  *See* 140 Ind. Admin. Code 6-1-2 (2008); LSA Document #08-215(F), Section 64 (Oct. 7, 2008).  The nine "lawful status" categories in Public Law 184-2007 mirrored those set out in federal legislation passed two years earlier, the Real ID Act of 2005 ("the Real ID Act"), which provided:

> EVIDENCE OF LAWFUL STATUS. — A State shall require, before issuing a driver's license or identification card to a person, valid documentary evidence that the person —
>
> (i)      is a citizen or national of the United States;

(ii)     is an alien lawfully admitted for permanent or temporary residence in the United States;

(iii)    has conditional permanent resident status in the United States;

(iv)    has an approved application for asylum in the United States or has entered into the United States in refugee status;

(v)     has a valid, unexpired nonimmigrant visa or nonimmigrant visa status for entry into the United States;

(vi)    has a pending application for asylum in the United States;

(vii)   has a pending or approved application for temporary protected status in the United States;

(viii)  has approved deferred action status; or

(ix)    has a pending application for adjustment of status to that of an alien lawfully admitted for permanent residence in the United States or conditional permanent resident status in the United States.

Pub. L. No. 109-13, § 202(c)(2)(B), 119 Stat. 231, 313 (2005).  The nine categories remained part of each of the respective Indiana code sections until H.E.A. 1050 exported them to a separate definitional section with minor facial alterations.  *See* 2023 Ind. Legis. Serv. P.L. 211-2023, Section 15 (May 4, 2023); *see also* Ind. Code § 9-13-2-92.3.

**B.     Federal Immigration Law and Humanitarian Parole**

**1.     Useful Definitions**

To properly understand the terminology relevant to this case, a brief discussion of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq*., and the definitions used in therein, is helpful.  An alien is "any person not a citizen or national of the United States."  8 U.S.C. § 1101(a)(3).  Alienage, though undefined by the INA, means the condition or status of being an alien.  BLACK'S LAW DICTIONARY (11th ed. 2019), *available at* Westlaw.

As non-citizens, aliens fall into four broad categories: "(1) persons seeking admission to the United States; (2) persons admitted as immigrants or lawful permanent residents; (3) persons

admitted as non-immigrants or temporary visitors; and (4) undocumented persons who are present in the country without the official knowledge or permission of the federal government."[3] WEISSBRODT ET AL., IMMIGRATION LAW AND PROCEDURE IN A NUTSHELL § 12-3.1 (8th ed. 2023), *available at* West Academic.

Under the INA, every alien is considered an "immigrant" (the second category) unless he or she demonstrates eligibility to be considered as one of the classes of "non-immigrant" aliens (the third category). *See* INA § 101(a)(15); 8 U.S.C. § 1101(a)(15). Humanitarian parolees are *not* defined, however, as non-immigrant aliens. *See id.* Thus, parolees fall into the first category above and are considered, in a technical sense, as having neither immigrant nor non-immigrant status.

An "[a]dmission" under the INA is defined as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer". §1101(a)(13)(A). In seeking admission, humanitarian parolees have not been formally "admitted". *See* 8 U.S.C. § 1101(a)(13)(B) ("An alien who is paroled under section 1182(d)(5) of this title . . . shall not be considered to have been admitted."). Their physical presence within the United States, however, is the result of a lawful entry made pursuant to federal policy and in compliance with federal immigration law.

The INA leaves undefined the commonly used phrase "lawful permanent resident" ("LPR"), but defines a "residence" as "the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent." 8 U.S.C.A. § 1101(a)(33). It also indicates the term "lawfully admitted for permanent residence" means "the

---

[3] The fourth category, encompassing what are colloquially referred to as "illegal aliens", is not relevant to this case.

status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws . . . ."  8 U.S.C.A. § 1101(a)(20).

## 2. **Humanitarian Parole and Special Programs**

The INA provides, with certain exceptions, that the "Attorney General may . . . in his discretion parole into the United States temporarily . . . any alien applying for admission to the United States".  8 U.S.C. § 1182(d)(5)(A).  A grant of parole is generally a discretionary act exercised on a case-by-case basis "for urgent humanitarian reasons or significant public benefit" and subject to such conditions as the Attorney General may prescribe.  *Id.*

Under recent policy, the federal government has established several special immigration initiatives to respond to specific humanitarian crises, which have granted parole to more than 350,000 persons from Afghanistan, Cuba, Nicaragua, Venezuela, Ukraine, and Haiti since 2021. ANDORRA BRUNO, CONG. RSCH. SERV., R47654, IMMIGRATION OPTIONS FOR IMMIGRATION PAROLEES 1 (2023).  Parole under these initiatives generally has been provided for two years, during which time the parolee may stay in the country and apply for work authorization.  *Id.*

Though beneficiaries of these special parole programs do not have dedicated pathways to LPR status or another immigration status, they may be eligible individually for one or more immigration mechanisms that offer a way to remain lawfully in the United States on a temporary or permanent basis.  Temporary mechanisms include submitting a new parole application or seeking temporary protected status ("TPS").  *Id.* at 6.  Important to the case before the Court, the Department of Homeland Security ("DHS") has continuously designated Haiti for TPS since August 2021.  *See* Designation of Haiti for Temporary Protected Status, 86 Fed. Reg. 41863 (Aug. 3, 2021); Extension and Redesignation of Haiti for Temporary Protected Status, 88 Fed. Reg. 5022 (Jan. 26, 2023).  Permanent mechanisms include an adjustment to status by means of family-based immigration, which directly grants LPR status, or asylum relief, which provides a dedicated

pathway to LPR status.   Bruno, Immigration Options at 7.   "The federal government will occasionally admit foreign nationals to the United States on humanitarian parole for humanitarian reasons with the anticipation that they would likely request asylum prior to the expiration of their parole period."  (Filing No. 39-1 at 1–2).

### 3.   <u>Haitian Humanitarian Parole Program</u>

In January 2023, DHS implemented a new parole program for Haitian nationals to "lawfully enter the United States in a safe and orderly manner."  Implementation of a Parole Process for Haitians, 88 Fed. Reg. 1243, 1243 (Jan. 9, 2023).  Viewing the success of its October 2022 parole program for Venezuelans, DHS implemented a similar process for Haitians to reduce the number of irregular entrances into the United States.  *See* 88 Fed. Reg. at 1243–1244.   On the same day, DHS also implemented similar processes to nationals of Nicaragua and Cuba, *see* Implementation of a Parole Process for Nicaraguans, 88 Fed. Reg. 1255 (Jan. 9, 2023); Implementation of a Parole Process for Cubans, 88 Fed. Reg. 1266 (Jan. 9, 2023), and increased the monthly limit to the Venezuelan process.  *See* Implementation of Changes to the Parole Process for Venezuelans, 88 Fed. Reg. 1279 (Jan. 9, 2023).

The Haitian process considered individuals on a case-by-case basis and required them to meet specified criteria in order to receive advance authorization for travel to the United States, including national security, public safety, and public health vetting.  88 Fed. Reg. at 1244.  The grant of parole under the process was set at two years, during which individuals could "seek humanitarian relief or other immigration benefits for which they may be eligible, and to work and contribute to the United States."  *Id.*

C. **Parties to the Litigation**

The Commissioner is the duly appointed head of the BMV and is sued in his official capacity (Filing No. 1 at 4).[4]

The Haitian Humanitarian Parolees are five Haitian nationals paroled into the United States under the January 2023 humanitarian parole program described above for a two-year period. *Id.* at 7, 9, 11. Their placement on parole may be subject to renewal upon expiration, *id.* at 9, 11, and at least two Plaintiffs intend to immigrate or attempt to remain in the United States at the conclusion of the initial period (*see* Filing No. 39-2 at 11, Filing No. 39-4 at 8).

The federal government's specific findings of humanitarian crisis in Haiti in implementing the parole program underscore the turbulent realities faced by Plaintiffs in their home country. Pursuant to the DHS Notice, "[v]iolence in Haiti reached an inflection point on July 7, 2021, with the assassination of Haitian President Jovenel Moïse", which "exacerbated political instability . . . , undermining state institutions and generating a power vacuum that has been occupied by gangs." (Filing No. 24-3 at 4.)  This is Plaintiffs' lived experience.  "[G]angs block roads, and that prevents people from travelling from places to places" and "affects everything in the country."  (Filing No. 39-2 at 11.)  Mr. St-Hilaire elaborates: "The fear is constant.  Today it might be that [a] friend got shot, and the next day it might be you.  Anything can happen to anybody at any time." *Id.*  In Mr. Meme's words, in Haiti, "your spirit is there, but you're discouraged with so many things." (Filing No. 39-3 at 5.)

Faced with these hurdles, as well as the country's "natural disasters, economic stagnation, [and] pervasive hunger" (Filing No. 24-3 at 4), Plaintiffs migrated, relocated to Indiana and, upon

---

[4] Plaintiffs' verified Complaint, *see* 28 U.S.C. § 1746, "is . . .  the equivalent of an affidavit" and may be relied on as evidence at the present stage.  *See Beal v. Beller*, 847 F.3d 897, 901 (7th Cir. 2017).

being paroled, received employment authorization from the federal government (Filing No. 1 at 9, 11–12; *see* Filing No. 1-3; Filing No. 1-6; Filing No. 1-7).  The adult Plaintiffs, (L.M.D.M. is a minor), obtained jobs, and all Plaintiffs live in rural Hancock and Spencer Counties, where public transportation is non-existent and personal vehicles are the dominant mode of transportation (Filing No. 1 at 3, 9–10, 12).

**D.      The Effect of H.E.A. 1050 on Haitian Humanitarian Parolees**

After obtaining his work authorization, Mr. St-Hilaire attempted to obtain his learner's permit from the BMV after passing both a written "knowledge" examination and a vision screening.  *Id.* at 10.  After applying, however, he received a letter from the BMV indicating that he was ineligible to receive a learner's permit and explaining "parolee status is not one of the lawful statuses covered by the REAL ID Act" and that he did not meet the eligibility requirements of H.E.A. 1050 or the Real ID Act (Filing No. 1-4).

Like Mr. St-Hilaire, the other adult Plaintiffs seek to receive driving credentials or state-issued identification cards (Filing No. 1 at 13), but are unable to do so.  L.M.D.M.'s family desires her to obtain an identification card.  *Id.*  Because they cannot drive or obtain personal vehicles, the adult Plaintiffs must rely exclusively on others to travel to and from their jobs and work around their schedules.  *Id.* at 10, 12.  This is exhausting and requires extraordinary effort.  All Plaintiffs, while grateful, very much wish they did not have to rely on others' assistance.  Obtaining driver's licenses and the resulting ability to drive would allow them to realize a level of self-sufficiency and independence – they could run errands, attend social events, and explore their community – that they currently are unable to experience.  *Id.* at 10, 12–13.

As a result, Haitian Humanitarian Parolees initiated this lawsuit against the Commissioner on September 5, 2023, seeking declaratory and injunctive relief from H.E.A. 1050 (Filing No. 1).

## II. <u>LEGAL STANDARD</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008).  "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (citation and quotation marks omitted).  Granting a preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser, Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citation and quotation marks omitted).

To obtain a preliminary injunction, the moving party must demonstrate: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm absent the injunction. *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012).  If the moving party fails to demonstrate any one of these three threshold requirements, the injunctive relief must be denied. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992).  At this stage of the analysis, "a mere possibility of success is not enough." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). Thus, Plaintiffs "must demonstrate that '[their] claim has some likelihood of success on the merits . . . , not merely a 'better than negligible' chance.'" *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (internal citations omitted).

If these threshold conditions are met, the Court must then assess the balance of the harm — the harm to Plaintiffs, if the injunction is not issued, against the harm to Defendants, if it is issued — and determine the effect of an injunction on the public interest. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020).  "[T]he more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa." *Mays*, 974 F.3d at 818.

11

Mandatory preliminary injunctions — those "requiring an affirmative act by the defendant" — are "ordinarily cautiously viewed and sparingly issued." *Id.* (quoting *Graham v. Medical Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997); *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) (review of a preliminary injunction is "even more searching" when the injunction is "mandatory rather than prohibitory in nature.")).

### III. <u>DISCUSSION</u>

The only issue before the Court is whether the Haitian Humanitarian Parolees are entitled to the preliminary injunctive relief they seek; specifically, to allow persons on humanitarian parole from countries other than Ukraine to obtain driver's licenses and identification cards, and to register and title vehicles, on the same terms and conditions as persons on humanitarian parole from Ukraine may do so. The Court will address each of the preliminary injunction factors in turn.

### A. <u>Likelihood of Success on the Merits</u>

#### 1. <u>Standing</u>

Standing arises under Article III's "case or controversy" requirement. *Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 688 (7th Cir. 2015) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). To establish Article III standing, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citation and quotation marks omitted). These irreducible constitutional minimum requirements for standing are jurisdictional. *See Dunnet Bay*, 799 F.3d at 688.

Each standing element must be supported by at least "the quantum of evidence required at each successive stage of litigation." *Midwest Fence Corp. v. United States Dep't of*

*Transportation*, 840 F.3d 932, 939 (7th Cir. 2016). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)); *see also Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 496 (7th Cir. 2005).

The Commissioner does not dispute that the Haitian Humanitarian Parolees have standing to challenge H.E.A. 1050's amendments to driver's license eligibility codified at Ind. Code § 9-24-9-2.5 (Filing No. 37 at 39 (arguing that Plaintiffs' claims are limited "by the fact that they only have standing to challenge" those amendments)); rather, they contend Plaintiffs lack standing to challenge the amendments to the identification card regulations in Ind. Code § 9-24-16-3.5 and the BMV's emergency rule modifying vehicle title regulations in 140 Ind. Admin. Code 6-1-2(a). *Id.* at 39, 40.

As to the first set of regulations, the Commissioner overlooks at a minimum that L.M.D.M.'s family wishes to obtain for her an identification card, since she is "obviously too young to receive a driver's license" (Filing No. 1 at 13), and to receive the assistance in everyday life brought by having one (*see* Filing No. 24-8 at 7–8). The statutory scheme thwarts her ability to do so, and prevents her from receiving the advantages therein. The record supports at this stage, the pleading stage, the conclusion that Plaintiffs have established Article III standing to challenge the regulations codified at Ind. Code § 9-24-16-3.5. The presence of one party with standing assures that the controversy is justiciable. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977) (stating that, because of the presence of an individual

plaintiff who demonstrated standing, the court "need not consider whether the other individual . . . plaintiffs have standing to maintain the suit").

Plaintiffs likewise establish Article III standing when it comes to the second set of regulations.  In at least one of the depositions cited by the Commissioner, Ms. Jean Marie clearly expresses that "[i]f [she] had [her driver's license], [she] would buy [her] own car and drive [her] own car."  (Filing No. 37-4 at 5.)  The later question, to which the Commissioner points and which counsel ostensibly asked for purposes of clarification, is compound.  *See id.* at 5–6.  In context, it is apparent that the question – of the same substance as the earlier question – confused the Plaintiff, who required the use of an interpreter throughout the deposition.  Moreover, in their verified Complaint, three Plaintiffs indicate that their hope, "if they are allowed to drive", is to "be able to purchase one or more additional vehicles."  (Filing No. 1 at 13.)  Possession of either driver's licenses and/or identification cards, which Plaintiffs also seek to achieve through victory in this litigation, is a necessary prerequisite for humanitarian parolees to title a vehicle.  *See* 140 Ind. Admin. Code 6-1-2 (mandating parolees "show proof of . . . having been granted parole … in the United States by presenting sufficient evidence showing the individual *meets the requirements* of: (1) IC 9-24-9-2.5 for a driver's license; or (2) IC 9-24-16-3.5(1) for an identification card") (emphasis added).

In any event, there can be little doubt that the Haitian Humanitarian Parolees meet the constitutional standing requirements at this litigation stage, including an injury in fact that is concrete and particularized.

"The essence of the standing inquiry is whether the parties seeking to invoke the court's jurisdiction have alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely

depends for illumination of difficult constitutional questions." *Larson v. Valente*, 456 U.S. 228, 238–39 (1982) (quoting *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72 (1978)) (internal quotation and citation removed). The challenged statutes and regulations, when taken together, stand as absolute barriers, making it impossible — not just difficult — to acquire state-issued driver's licenses and identification cards and, in turn, vehicular titles. The consequences which have been visited upon the Plaintiffs as a result of the alleged equal protection violation are anything but speculative or hypothetical. Absent judicial intervention, they face the prospect of foregoing these benefits indefinitely, while those benefits are freely available to persons in the favored class (humanitarian parolees fulfilling the requirements of Indiana Code § 9-13-2-121.5).

As the United States Supreme Court explained in Northeastern Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.,

> [w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

508 U.S. 656, 666 (1993). Here, Indiana Code § 9-13-2-121.5 obviously targets and distinguishes between classes of humanitarian parolees. If the Indiana statute permitted all humanitarian parolees alike to obtain licenses, identification cards, or titles, plaintiffs would not need to bring this suit. Haitian Humanitarian Parolees have therefore demonstrated injuries for purposes of constitutional standing. *See, e.g.*, *Turner v. Fouche*, 396 U.S. 346, 362 (1970) ("We may assume that the [plaintiffs] have no right to be appointed to the . . . board of education. But [they] do have a federal constitutional right *to be considered* for public service *without the burden of invidiously discriminatory disqualifications*") (footnote omitted) (emphasis added).

15

2.    **Merits**

Haitian Humanitarian Parolees make three separate arguments challenging the legality of H.E.A. 1050.  First, the law violates Title VI's prohibition against national origin discrimination.  Second, the law violates the Equal Protection Clause's prohibition against national origin discrimination.  Third, H.E.A. 1050 is preempted by federal law.  The Court is persuaded that the Haitian Humanitarian Parolees have established a strong likelihood of success on the merits of their Equal Protection Clause argument and, thus, need not resolve the Title VI or preemption claims.  Before turning to the equal protection claim, however, the other two claims warrant discussion as it appears upon cursory review that Plaintiffs may also have a reasonable likelihood of success as to each.

a.    **Title VI Claim**

The BMV receives federal financial assistance and therefore is subject to the requirements of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*., as both parties agree ([Filing No. 39-1](#)).  Title VI, an integral part of the far-reaching Civil Rights Act of 1964, serves as a broad prohibition against the exclusion of *any* individual from a federally funded program on the ground of race: "Title VI stands for the general principle that *no person* . . . be excluded from participation . . . on the ground of race, color, or national origin . . . ."  *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 413 (1978) (Stevens, J., concurrence) (emphasis in original) (internal quotation and citation omitted).

Specifically, Section 601 of that Title provides that no person shall, "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI.  *Alexander v. Sandoval*, 532 U.S. 275, 278 (2001) (quoting 42 U.S.C. § 2000d).  As in the case here, "private individuals may sue to enforce § 601 of Title VI and obtain both injunctive relief and damages."

16

*Alexander*, 532 U.S. at 279 (discussing *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979)). Second, at the heart of the dispute here, § 601 prohibits only intentional discrimination, *id.* at 280 (discussing *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978)), and follows the Fourteenth Amendment's standard of proof for intentional discrimination. *See Bakke*, 438 U.S. at 412–18. Title VI's prohibition reaches a wide variety of practices, including several akin to the situation now before the Court, such as the denial of individual aid or benefits, differential treatment in relation to such aid or benefits, and using any criteria that would impair accomplishment of the Act's objectives or that would subject individuals to discrimination. *See* RODNEY A. SMOLLA, 1 FEDERAL CIVIL RIGHTS ACTS § 8:3 (3d ed. 2023), *available at* Westlaw FCIVRTACTS.

The Haitian Humanitarian Parolees assert H.E.A. 1050 classifies on the basis of national origin and, in doing so, "say[s] the quiet part out loud", facially constituting intentional national-origin discrimination (Filing No. 25 at 18) (quoting *Thompson v. Alabama*, 65 F.4th 1288, 1320 (11th Cir. 2023) (Rosenbaum, J., concurring in part and dissenting in part). By its terms, H.E.A. 1050 requires the BMV to issue driver's licenses and identification cards to persons on humanitarian parole who are "citizen[s] or national[s] of Ukraine" or last were "a habitual resident of Ukraine". Ind. Code § 9-13-2-121.5. It does not allow for the issuance of licenses or identification cards to persons from any other country. In other words, as Plaintiffs allege, if any of them were Ukrainian, they would be entitled to receive an Indiana driver's license or identification card, but because they are Haitians, they are not. In response, the Commissioner argues that the challenged part of the statute merely applies a classification previously made by Congress to paroled Ukrainians (Filing No. 37 at 16), but joins his response to Plaintiffs' Title VI argument to his response to their Equal Protection Clause argument. *See id.* at 15 n.15.

The Court agrees with Plaintiffs that the Commissioner does not argue they fail to meet any of the "classifications" criteria the Commissioner outlines in Section 401(a) of the AUSAA other than the national origin requirement.  Moreover, as Section 17 of H.E.A. 1050 explicitly states, all four criteria that the Commissioner points to are derived from the AUSAA.  On first blush, the decision to incorporate this statute, and no other, and tether eligibility requirements for state-issued identification to a federal law addressing humanitarian parolees from Ukraine, but from no other country, seems to be national-origin discrimination by another name.  Nevertheless, since the Court finds that the Haitian Humanitarian Parolees are likely to succeed on the merits of their claim that H.E.A. 1050 constitutes impermissible discrimination in violation of the Equal Protection Clause, *see infra*, the Court need not now determine the issue of whether Plaintiffs will succeed on the merits of their argument concerning Title VI.

### b.    <u>Preemption Claim</u>

Turning to preemption, conflict preemption occurs where the state action "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 578 (7th Cir. 2012).  *See also De Canas v. Bica*, 424 U.S. 351, 363 (1976).  The Commissioner argues that Indiana, as a state, possesses broad authority to regulate driver's licenses, which constitutes an area of "traditional state concern", *Ariz. Dream Act Coal*, 855 F.3d at 973, and that this power is not superseded absent a "clear and manifest purpose" from Congress.  *Arizona v. United States*, 567 U.S. 387, 400 (2012).  The Commissioner alleges the INA is silent about the issuance of driver's licenses and that the Real ID Act sets standards for credentials accepted by the federal government.

The Commissioner misses the mark in at least two ways.  Narrowly focusing upon Congress's express exemption of parolees from the Real ID Act, the Commissioner cites to the Fifth Circuit case of *LeClerc v. Webb*, to suggest that H.E.A. 1050 may be in accord and not

18

conflict with federal regulation.   419 F.3d 405 (5th Cir. 2005).   In affirming a district court judgment that federal immigration or trade policy did not preempt a state law barring non-immigrant aliens from sitting for the Louisiana bar, the *LeClerc* court found that the state law was "designed to address local problems arising from the transitory status of nonimmigrant aliens who, by the terms and conditions of their federal status, possess fewer ties to the United States than any other group (besides illegal aliens)."   *Id.* at 425.   Without saying as much, this is how the Commissioner views Plaintiffs — as transitory, non-immigrant aliens who possess fewer ties to the United States than any other group besides illegal aliens and "whom Congress ha[d] expressly prohibited from living or working permanently in the United States."   *Id.*

    The Court is not convinced that the Haitian Humanitarian Parolees, by terms of their federal status, are aliens who are *expressly foreclosed* from potential permanent immigrant status — or at least not entirely.   Humanitarian parolees are eligible to apply for legal permanent residency (and eventual citizenship) by utilizing an adjustment of status.   They are, therefore, potentially admissible. When the INA was originally enacted in 1952, it did not allow a parolee to apply for adjustment of status, which is the standard process to obtain legal permanent residence status while in the United States.   However, when Congress amended Section 245(a) of the INA in 1960, it provided for the adjustment of status of an alien who had been "inspected and admitted *or paroled*" into the United States, Pub. L. No. 86-648, § 10, 74 Stat. 505 (1960) (emphasis provided), thereby giving parolees potential, viable pathways to LPR status.   *See* 8 U.S.C. 1255(a).   Indeed, "[t]he federal government will occasionally [permit] foreign nationals to [enter] the United States on humanitarian parole for humanitarian reasons with the anticipation that they would likely request asylum prior to the expiration of their parole period." ([Filing No. 39-1 at 1-2](#)).   Such facts as would properly demonstrate whether Plaintiffs intend to obtain a change of status to permanent residency by this or other avenues

are not currently before the Court, however.  For the present purposes of its cursory preemption analysis, the Court is satisfied that the Haitian Humanitarian Parolees are, as potentially admissible aliens, not a class of persons whom Congress has "expressly prohibited" from living or working permanently in the United States.  419 F.3d at 425.

Moreover, the Court agrees at this stage with the Haitian Humanitarian Parolees on a different, related point.  While a state has the power to impose eligibility requirements to receive a license, or to limit their availability to persons of certain immigration statuses, *i.e.*, providing licenses only to, say, the classes of non-citizens whom Congress deems eligible for Real IDs, Indiana cannot discriminate *between* persons sharing the <u>same federal immigrant status</u>.  The Court finds the relevant federal immigration status in this case, applicable to both the Haitian Plaintiffs and their Ukrainian counterparts, is the status of humanitarian parolee pursuant to the discretionary parole authority granted to the Attorney General under 8 U.S.C. § 1182(d)(5)(A).  *Cf.* GEOFFREY HEEREN, *The Status of Nonstatus*, 64 AM. U. L. REV. 1115, 1134–36 (2015) (describing parole under § 1182(d)(5) as "nonstatus", or a "legal limbo that is officially not status at all").

The cases cited by Haitian Humanitarian Parolees demonstrate that courts, across a variety of contexts, have held as preempted state laws seeking to classify non-citizens in manners apart from federal standards.  (*See* [Filing No. 25 at 26–28](#) (citing, *e.g.*, *Hispanic Interest Coal. of Alabama v. Bentley*, 2011 WL 5516953, at *20, 23–24, 53 (N.D. Ala. Sept. 28, 2011) enjoining Alabama statute that redefined "lawful presence" in the United States for purposes of eligibility for public postsecondary education to include only persons with "lawful permanent residence or an appropriate nonimmigrant visa under 8 U.S.C. § 1101, et seq." in exclusion of other categories of noncitizens also qualifying as "lawfully present" under the INA)), *superseded in relevant part*, Section 1, 2012 Ala. Legis. Serv. 2012-491, *and vacated as moot sub nom. Hispanic Interest Coal.*

20

*of Ala. v. Governor of Ala.*, 691 F.3d 1236 (11th Cir. 2012); *LULAC v. Wilson*, 908 F. Supp. 755, 778 (C.D. Cal. 1995) ("Since some persons otherwise eligible for benefits under federal standards would be excluded by Proposition 187's underinclusive classification scheme, denying services based on the classification scheme conflicts with the existing federal eligibility system", as articulated in *De Canas*, 424 U.S. at 363), *on reconsideration on different grounds*, 997 F. Supp. 1244 (C.D. Cal. 1995)).

In sum, when H.E.A. 1050 attempts in Section 17 to prune Haitians (or Venezuelans, or Cubans, or Nicaraguans, etc.) from the definition of parolees, it impermissibly differentiates between *groups* of parolees as distinct from other groups in a manner that Congress's grant of authority to the Attorney General cannot be said to have contemplated.  Singling out a subset of aliens, then, fetters the accomplishment and execution of Congress's purposes and objectives: effectively it is Indiana, and not the federal government, classifying between parolees when the state forecloses driver's licenses, identification cards, and vehicular titles from discrete subclasses of aliens also granted parole under the same discretionary authority, but who do not meet certain criteria (regardless of whether Congress established the criteria).  The law is well established that "[t]he States enjoy no power with respect to the classification of aliens.  This power is 'committed to the political branches of the Federal Government.'"  *Plyler v. Doe*, 457 U.S. 202, 225 (1982) (citing *Hines v. Dadowitz*, 312 U.S. 52, 61 (1941); quoting *Mathews v. Diaz*, 426 U.S. 67, 81 (1976)).  As a result, upon first glance, it appears to the Court that Section 17 imposes an improper "classification" between aliens by impermissibly defining "parole" limitedly.  457 U.S. at 225.  Only Congress may classify aliens.  Again, however, the Court foregoes reaching a success-on-the-merits conclusion on these passing observations.  It turns instead to Plaintiffs' third and last

argument concerning the Equal Protection Clause, for which it finds they have a strong likelihood of success in challenging the statute.

### c.        **Equal Protection Claim**

The Court starts with the text of the U.S. Constitution: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . . nor deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV. The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike" under the law.  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  If a state does not burden a fundamental right or target a suspect classification, the law or policy will withstand constitutional scrutiny so long as it bears a rational relationship to a legitimate state interest.  *Vacco v. Quill*, 521 U.S. 793, 800 (1997). However, if a state law or policy makes a classification based on race, national origin, or alienage, such law violates the Equal Protection Clause unless the state can demonstrate that the policy is "necessary to further a compelling governmental interest" and "narrowly tailored to that end." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 316 (2013) (Thomas, J., concurring) (quoting *Johnson v. California*, 543 U.S. 499, 514 (2005)); *see also Cleburne Living Ctr.*, 473 U.S. at 440. The Court must first determine the applicable level of scrutiny and then assess whether the challenged statute withstands the proper scrutiny.

### i.        **Applicable Level of Scrutiny under the Equal Protection Clause**

Haitian Humanitarian Parolees argues that H.E.A. 1050 discriminates facially on the basis of national origin and therefore must be subject to strict scrutiny.  Contrarily, the Commissioner argues that Plaintiffs are not a suspect class entitled to strict scrutiny, and relies upon *Plyler*, 457 U.S. at 219 n.19, where the Supreme Court applied rational basis review to a class of undocumented children, and *LULAC v. Bredesen*, 500 F.3d 523 (6th Cir. 2007), in which the Sixth

Circuit applied rational basis review to a class of temporary residents. Turning to H.E.A. 1050, the Commissioner alleges that relying upon the AUSAA, a federal statute paroling Ukrainians, and adopting an identical classification to pursue a goal consistent with the federal purpose, should not implicate heightened scrutiny.

The Court starts by noting the previous observations it made above regarding Section 17's likely impermissible classification of parolees. It further observes that the AUSAA is notably silent when it comes to affording driver's licenses (Real-ID or otherwise) to Ukrainian aliens, thereby undermining the Commissioner's contention that the state's decision aligns with Congress's intent in the AUSAA. *See* Pub. L. No. 117-128, § 401(a). *See also* Filing No. 37 at 23.

Seeking support for the proposition that Indiana can do what Congress has done (or, more accurately, could have done), the Commissioner points to *Mathews v. Diaz*, a case upholding a *federal* statute limiting certain benefits to LPRs who had resided in the United States for at least five years. 426 U.S. at 81–84. While *Mathews* stands for the proposition that *Congress* can make distinctions between groups of aliens, it does not follow, however, that a state legislature is authorized to piggy-back onto Congress to derive its own power, apply distinctions between non-citizens, and pursue federal goals; "it is the business of the political branches of the Federal Government, rather than that of . . . the States . . . , to regulate the conditions of entry and residence of aliens." *Id.* at 84. *In dicta*, the Supreme Court has opined that even the federal government cannot delegate this power to individual states. *See Graham v. Richardson*, 403 U.S. 365, 382 (1971) ("Although the Federal Government admittedly has broad constitutional power to determine what aliens shall be admitted to the United States, . . . Congress does not have the power to authorize the individual States to violate the Equal Protection Clause.").

Unlike *Mathews*, this case involves a distinction authorized (and administered) by a state legislature that has adopted restrictions about aliens that are not mandated by federal law. This case is more like *Graham*, 403 U.S. 365, which, as the *Mathews* Court noted, "involve[d] significantly different considerations . . . concern[ing] *the relationship between aliens and the States*". 426 U.S. at 84–85 (emphasis added).

Since *Graham*, the Supreme Court has repeatedly applied strict scrutiny to state classifications based on national origin and alienage, holding that "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny," and that "[a]liens as a class are a prime example of a 'discrete and insular' minority for whom such heightened judicial solicitude is appropriate." *Graham*, 403 U.S. at 372 (internal citation and quotation marks omitted). The *Graham* court struck down two state statutes that prevented aliens from receiving public assistance. *Id.* at 376. The statutes erected different barriers — a Pennsylvania law barred non-citizens from a state welfare program, while an Arizona law required that aliens reside in the state for fifteen years before they could collect money from the state — but both achieved the same result of denying aliens access to a benefit available to citizens. *Id.* at 367–68. Thus, *Graham* held as unconstitutional this "two class" system. *Id.* at 371.

The *Graham* court saw Pennsylvania and Arizona's restrictions on welfare as exacting a similar toll as an earlier fishing-license regime it had struck down years earlier. In *Takahashi v. Fish & Game Comm.*, the Supreme Court struck down a California statute that denied fishing licenses to any "person ineligible [for] citizenship". 334 U.S. 410, 413 (1948). The state legislature feared that its law, originally targeting Japanese fisherman, would run afoul of the Equal Protection Clause and amended the statute to instead prohibit immigrants "ineligible [for] citizenship" from obtaining fishing licenses. *Id.* The provision distinguished between groups

24

based solely on the members' immigration status without mentioning race or nationality.  The court held that treating groups differently based on their alienage was akin to discriminating against a group because of the members' race or color.  The court explained that "[t]he Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that *all persons lawfully in this country* shall abide 'in any state' on an equality of legal privileges with all citizens under nondiscriminatory laws."  *Takahashi*, 334 U.S. at 420 (emphasis added).

In the years following *Graham*, the Supreme Court continued to apply strict scrutiny to statutes discriminating on the basis of alienage.  For example, in *Nyquist v. Mauclet*, the court applied strict scrutiny and found that a New York state college scholarship program requirement violated the Equal Protection Clause because it limited awards only to U.S. citizens, refugees, or those who intended to seek U.S. citizenship when eligible.  432 U.S. 1, 12 (1977).

The Commissioner nevertheless argues that the Supreme Court's strict scrutiny analysis is inapplicable to classifications of parolees and that only rational basis review of the statute is required.  The Commissioner contends that the Supreme Court has employed strict scrutiny with respect to only one subclass of aliens, lawful permanent residents (Filing No. 37 at 23 (quoting *Bredesen*, 500 F.3d at 532–33)), and reasons that a statute discriminating between paroled aliens should not receive strict scrutiny review.  *Id.* at 24.

In *Bredesen*, the Sixth Circuit upheld a Tennessee law that "condition[ed] issuance of a driver's license upon proof of United States citizenship or legal permanent resident status."  500 F.3d at 526, 533.  The Sixth Circuit held that non-immigrant aliens are not a suspect class because, unlike citizens and LPRs, they "are admitted to the United States only for the duration of their authorized status, are not permitted to serve in the U.S. military, are subject to strict employment

restrictions, incur differential tax treatment, and may be denied federal welfare benefits." *Id.*; *see also LeClerc*, 419 F.3d at 418–19.

Despite the fact that the Supreme Court has never cabined its precedent in *Graham* to distinguish between discrimination against LPRs and discrimination against other lawfully present aliens and has never distinguished *Takahashi*, the Sixth Circuit in *Bredesen* and the Fifth Circuit in *LeClerc* narrowed *Graham*. *See Dandamudi v. Tisch*, 686 F.3d 66, 75 (2d Cir. 2012). They did so by likening permanent resident aliens to citizens, based on a view that permanent resident aliens were "similarly situated to citizens in economic, social, and civic conditions." 500 F.3d at 533; *see* 419 F.3d at 418.

As the Second Circuit points out in *Dandamudi*, however, the *Bredesen* and *LeClerc* Courts rested their analyses on the "closing words of *Graham*'s discussion of the Equal Protection Clause", wherein the Supreme Court noted "[a]liens like citizens pay taxes and may be called into the armed forces. Unlike the short-term residents in *Shapiro* [*v. Thompson*, 394 U.S. 618 (1969)], aliens may live within a state for many years, work in the state and contribute to the economic growth of the state." 686 F.3d at 75 (quoting 403 U.S. at 376). The *Graham* court "in essence pointed out that, because LPRs and citizens have much in common, treating them differently does not pass muster under the Fourteenth Amendment." *Id.* at 76. The converse of this rationale, however, does not become a litmus test for determining whether a particular group of aliens is a suspect class. *Id.* At best, treating humanitarian parolees unlike LPRs for purposes of determining which scrutiny to apply "boil[s] down to one potentially important difference — [the members of the subclass in question] have not yet obtained permission to reside in the United States permanently — and a slew of other differences of uncertain relevance." *Adusumelli v. Steiner*, 740 F. Supp. 2d 582, 592 (S.D.N.Y. 2010), *aff'd sub nom. Dandamudi*, 686 F.3d 66.

Ultimately, this Court finds that humanitarian parolees are sufficiently similarly situated to citizens in the ways that *Graham* found as relevant. Though not yet admitted, humanitarian parolees pay taxes, often on the same terms as citizens and LPRs, and certainly on income earned in the United States. *See* 26 U.S.C. § 7701(b); *see also* 686 F.3d at 77 (citing *LeClerc*, 419 F.3d at 427 n. 1 (Stewart, J., dissenting)). As demonstrated on the record already before the Court, most of the Haitian Humanitarian Parolees already work in the state, support the economy, and contribute in other ways to Hoosier society besides serving in the armed forces. And, as aliens seeking admission to the United States, the Plaintiffs have the very real possibility of living within Indiana for many years to come. At a minimum, they have at least another year left on their parole — but at a maximum, however, they are eligible to apply to and obtain asylum or some other relief and ultimately find permanent residency in the state.

Said differently, most of the factual or legal differences differentiating humanitarian parolees from LPRs (or, in turn, from citizens) are, at this stage in the parolees' journey to admission, either inapplicable or without constitutional relevance. The Commissioner fails to sufficiently explain to the Court how the federally imposed restrictions on humanitarian parolees relate to state policy or otherwise impact the Equal Protection Clause analysis.[5] *See Takahashi*, 334 U.S. at 419 ("It does not follow . . . that because the United States regulates immigration and naturalization . . . a state can adopt one or more of the same classifications to prevent lawfully admitted aliens within its borders from earning a living in the same way that other state inhabitants earn their living.").

---

[5] As the Second Circuit noted, "[s]ome of the other distinctions relied on by [the *Bredesen* and *LeClerc* Courts] (military service and ineligibility for federal benefits) simply lack legislative relevance." *Dandamudi*, 686 F.3d at 77 n.14. The federal government bears the responsibility for regulating immigration and has broader latitude to distinguish among subclasses of aliens. *Id. See also Plyler*, 457 U.S. at 225. But, as the Court noted above, this latitude does not give states the power to do the same. *See Plyler*, 457 U.S. at 225; *Takahashi*, 334 U.S. at 420.

The Commissioner's appeals to *Korab v. Fink*, 797 F.3d 572, 576 (9th Cir. 2014), and *Soskin v. Reinertson*, 353 F.3d 1242, 1246 (10th Cir. 2004), are unavailing as these cases are easily distinguishable.  Each of those cases involved specific congressional authorization not found here. The federal Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105 (1996) (often referred to as the "Welfare Reform Act") provided that the states could adopt welfare coverage restrictions, which the *Korab* and *Soskin* Courts found, "in essence, create[d] two welfare programs, one for citizens and one for aliens."  353 F.3d at 1255; *accord* 797 F.3d at 580 (describing the categories that states must follow, one of which allows for "limited discretion").  Congress's clear expression of its intent in the Welfare Reform Act was to give "states a measure of discretion" such that, the state's exercise of the discretion, would effectuate national policy. 353 F.3d at 1255.  "Once Congress has expressed that policy, the courts must be deferential" and apply rational-basis review.  *Id.  But see Aliessa v. Novello*, 754 N.E.2d 1085, 1098 (N.Y. 2001) (concluding that strict scrutiny was the appropriate standard by which to assess a New York statute that terminated state-only Medicaid coverage post-Welfare Reform Act for many aliens).

Here, the Court finds no similar federal intent within the Real ID Act of 2005.  The Act evinces a clear expression of intent by Congress to delimit one type of vehicle credential — Real IDs — for purposes of recognition by federal agencies.  From the Court's review, the Act does not grant any measure of discretion in effectuating national policy, such that a state's exercise of it would effectuate national policy.  Accordingly, the Court sees the Real ID Act as sufficiently dissimilar from the Welfare Reform Act, despite the Commissioner's analogizing, and remains unpersuaded that *Korab* and *Soskin* dictate rational basis scrutiny.

The Commissioner additionally points to a case in which the term "national origin" for purposes of equal protection is discussed in terms of the "particular country in which one was born" (Filing No. 37 at 22 n.16 (quoting *Shen v. Simpson*, No. 4:23-cv-208, 2023 WL 5517253, at *6 (N.D. Fla. Aug. 17, 2023))).  But as Plaintiffs point out, the Supreme Court has equated national origin discrimination to discrimination based on one's nationality.  *See Graham*, 403 U.S. at 371–372 ("[T]he Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny.") (internal footnotes omitted); *see also Exodus Refugee Immigr., Inc. v. Pence*, 838 F.3d 902, 905 (7th Cir. 2016) (holding that the uneven distribution of benefits to refugees from different countries constituted impermissible discrimination "on the basis of . . . nationality").

The Court finds its own statements in a different case, pertaining to discrimination against refugees, to be once again applicable in the case here involving humanitarian parolees:

> [The] argument, therefore, that national origin discrimination does not include discrimination based on nationality is directly contrary to the Supreme Court's statement in *Graham* and cases following it.  Moreover, the Supreme Court has held that classifications based on "country of origin" are subject to strict scrutiny, and in so doing discussed "country of origin" in terms of both ancestry and nationality. *Oyama v. California*, 332 U.S. 633, 640, 68 S.Ct. 269, 92 L.Ed. 249 (1948) (holding that discrimination "based solely on . . . country of origin" requires a "compelling justification" to overcome an equal protection challenge).
>
> The foregoing shows that, whether framed as ancestry, nationality, citizenship, or country of origin, national origin discrimination encompasses classifications based on where a person is from or based on specific characteristics that reflect as much. The fact that the Supreme Court uses different terms when discussing national origin discrimination reflects not . . . that national origin discrimination includes only discrimination based on one of these discrete categories; it instead reflects that such classifications are examples of ways in which national origin discrimination occurs.
>
> *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 734 (S.D. Ind.), *aff'd*,

838 F.3d 902.  Here, H.E.A 1050, which singles out and separates Ukrainian citizens, nationals,

or habitual resident parolees from other parolees (Haitian or otherwise), can fairly be described as a classification based on "nationality"[6] or "country of origin."

Assuming *arguendo* that strict scrutiny does not apply, heightened scrutiny is warranted. Although the Supreme Court has not settled on a definitive test for whether a certain classification is subject to heightened scrutiny, it has looked to certain criteria, such as whether the characteristic defining the class "bear[s] no relation to the individual's ability to participate in and contribute to society," *Cleburne Living Ctr.*, 473 U.S. at 441 (internal quotation and citation omitted), is "beyond the individual's control", *id.*, or is "immutable," *Lyng v. Castillo*, 477 U.S. 635, 638 (1986), and whether the class is politically powerless or has been subjected to a history of discrimination, *see Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 314 (1976).  The Court finds that the crucial characteristic at issue – whether the individual last held citizenship or national status or prior habitual resident status in Ukraine – is, while not immutable,[7] clearly intended to benefit only those of Ukrainian origin akin to classifications based on race or national origin.  And "[a]liens as a class are a prime example of a "discrete and insular'  minority . . . for whom . . . heightened judicial solicitude is appropriate." *Graham*, 403 U.S. 372 (internal citations omitted).  For these reasons, some scrutiny more discerning than rational basis is warranted.

In the end, the Commissioner "tries to complicate a question that is rather straightforward. It is treating [certain humanitarian parolees] who originate from [Ukraine] differently than those from other countries.  If this is not national origin discrimination, the Court does not know what is." *Exodus*, 165 F. Supp. 3d at 735, *aff'd*, 838 F.3d 902.  No different result is reached by whether

---

[6] Black's Law Dictionary defines "nationality" as the "relationship between a citizen of a country and the country itself, customarily involving allegiance by the citizen and protection by the state; membership in a country." BLACK'S LAW DICTIONARY (11th ed. 2019), *available at* Westlaw.  This term is often used synonymously with citizenship. *Id*.

[7] Indeed, with great effort and by subjecting themselves to much danger, an individual could certainly locate first to Ukraine, obtain a qualifying status, and then locate again to the United States.

one views the discrimination in question as one based on alienage (*i.e.*, distinguishing between citizens and humanitarian parolees) or national origin (*i.e.*, distinguishing between one group of humanitarian parolees versus another group).  What the Commissioner cannot do with respect to one, he certainly cannot do with respect to the other.  At the end of the day, the Court finds that the Haitian Humanitarian Parolees have shown that strict scrutiny applies.

### ii.    Application of Strict Scrutiny under the Equal Protection Clause

As stated above, classifications based on alienage or national origin are subject to strict scrutiny.  *Cleburne Living Ctr.*, 473 U.S. at 440; *see also Vision Church v. Village of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006).  To survive strict scrutiny, the challenged action must be narrowly tailored to serve a compelling governmental interest.  *See Fisher*, 570 U.S. at 316 (Thomas, J., concurring); *see Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007).

The Commissioner ostensibly presents three interests that he argues satisfy the burden of showing that H.E.A. 1050 is rationally related to a legitimate state interest.  First, the Commissioner asserts that the state legislature's choice in treating Ukrainians federally covered under the AUSAA like Afghan humanitarian parolees covered by Section 2502 of the Afghanistan Supplemental Appropriations Act was reasonable, since "both would likely remain in the United States longer than their two-year period of humanitarian parole"  (Filing No. 37 at 28).  The Commissioner further maintains the choice is consistent with the congressional purpose of separately classifying and benefitting both groups.  Second, the Commissioner suggests, without elaboration, that the "cost of providing additional benefits" serves as a rational basis to providing benefits to some and not others.  *Id.* at 28–29 (citing *Racine Charter One, Inc. v. Racine Unified Sch. Dist.*, 424 F.3d 677, 686 (7th Cir. 2005); *Irizarry v. Bd. of Educ. of City of Chi.*, 251 F.3d 604, 610 (7th Cir. 2001)).  Third, the Commissioner contends that Indiana's goal of narrowly limiting

the exception to its Real ID program to only covered Ukrainians furthered its legitimate goal of eventually becoming a Real ID-only state. The Commissioner argues that a "dramatic expansion of issuing non-Real ID licenses to parolees would hinder" the progress and "create significant inconsistencies" in official messaging. *Id.* at 29.

The Haitian Humanitarian Parolees maintain that the Commissioner does not attempt to justify H.E.A. 1050 under the strict scrutiny standard and that the attempt to do so under rational basis review fails. Assuming that "limiting licenses and state-issued identification to persons likely to be here for a longer period of time" is a legitimate interest, the "factual predicates underlying this interest are simply wrong" as Haitians humanitarian parolees are also eligible for refugee assistance (Filing No. 40 at 13). They further argue that Indiana, in extending to Ukrainians the ability to obtain driver's licenses and identification cards, appropriately recognizes the importance of these forms of identification in enabling humanitarian parolees to work, socialize, access health care and other necessary resources, and fully immerse themselves in society. However, "none of this is unique to Ukrainians", and that being the case, Indiana has no basis in distinguishing Ukrainians from persons from other countries (Filing No. 25 at 22).

While Plaintiffs' position with regard to whether the Commissioner's stated interests survive a rational basis review is persuasive, that is not the analysis in which the Court must engage. As to the issue before the Court, that is, whether these stated interests pass muster under strict scrutiny, the Commissioner takes no position.

The Court is doubtful that the Commissioner has carried the burden of proving that any of the mentioned interests are compelling. No evidence supports the first stated interest. The concern for similar treatment of covered Ukrainian parolees and covered Afghan parolees itself rests on a dubious foundation that Congress treats the two groups similarly to the exclusion of other

humanitarian parolees.  In fact, Congress does not treat the two groups similarly for the purposes relevant to this case: the AUSAA is silent when it comes to affording driver's licenses (Real-ID or otherwise) to Ukrainian aliens.  Also, as the Plaintiffs point out, Haitian entrants are "considered to have been paroled in the special status for nationals of Cuba or Haiti, referred to in section 501(e)(1) of the Refugee Education Assistance Act of 1980", 8 C.F.R. § 212.5(h), and are therefore eligible as "qualified aliens", *see* 8 U.S.C. § 1641(b)(7), for federal public benefits, *see* 8 U.S.C. § 1611(c), such as specified and designated federal programs, *see* 8 U.S.C. § 1612(a)(2), -(b)(2), and federal means-tested public benefits.  *See* 8 U.S.C. § 1613(b)(1).  As to the second interest, the Commissioner's evidence in support does not demonstrate that the administrative burden and costs associated with providing the additional benefits at issue here would be anything more than *de minimis*.  As such, the Court finds the prevention of nominal costs, though perhaps legitimate, to be less than compelling.  As to the third interest, the State's own grandfathering of non-Real ID credentials, and renewals of them to the present day, undermines its professed goal of eventually becoming a Real ID-only state.

Even accepting *arguendo* that the stated interests are compelling, H.E.A. 1050 is not narrowly tailored to meet those ends.  At its core, the first stated interest is concerned with treating alike those who, in the Commissioner's words, "would likely remain in the United States longer than their two-year period of humanitarian parole".  H.E.A. 1050 is silent as to humanitarian parolees' length of stay in Indiana and theoretically allows covered Ukrainians to obtain the desired credential on their first day in the United States.  With respect to the second interest, H.E.A. 1050 makes no restrictions as to the number of parolees eligible to receive a non-Real ID credential, nor does it otherwise limit their provision to a cap that would preserve the state's professed interest in remaining fiscally and administratively unburdened.  Withholding the benefit from one group on

the grounds of cost, while providing for another group open-handedly and without limitation, cannot be said to be narrowly tailored or "'fit[ting]' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Grutter v. Bollinger*, 539 U.S. 306, 333 (2003) (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 493 (1989) (plurality opinion)). Similarly, since no restrictions are made within H.E.A. 1050 as to the number of parolees eligible to receive a non-Real ID credential, its provisions cannot be said to be tailored to meet the interest of becoming a Real ID-only state, let alone narrowly. That only 136 non-Real ID credentials have been issued under H.E.A. 1050 does not shield the statute from this ruinous consideration. A narrow, more effective statutory scheme would, at a minimum, elect to impose an expiration on the issued credentials or require eligible parolees who are issued provisionary non-Real ID credentials to, at some point, obtain a Real ID substitute *viz-a-viz* the achievement of lawful status.

Having failed to survive strict scrutiny by a wide margin, there is a strong likelihood that H.E.A. 1050's provision of credentials to certain Ukrainian parolees and no other humanitarian parolees violates the Equal Protection Clause.

**B.     Irreparable Harm**

A plaintiff seeking preliminary injunction "must show that [he] has no adequate remedy at law and, as a result, that [he] will suffer irreparable harm if the injunction is not issued." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) (citing *Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 386 (7th Cir. 1984)).

> This requires more than a mere possibility of harm. It does not, however, require that the harm actually occur before injunctive relief is warranted. Nor does it require that the harm be certain to occur before a court may grant relief on the merits. Rather, harm is considered irreparable if it cannot be prevented or fully rectified by the final judgment after trial.

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045 (7th Cir. 2017) (citations and internal quotation marks omitted), abrogation on other grounds recognized by Pritzker, 973 F.3d at 762.

This Court has previously observed that "[a] vehicle's importance as a means to earn a living and participate in the activities of daily life is particularly pronounced in Indiana, where public transportation options are limited, even in the state's largest cities." *Washington v. Marion Cnty. Prosecutor*, 264 F. Supp. 3d 957, 976 (S.D. Ind. 2017), *remanded in light of statutory amendments*, 916 F.3d 676 (7th Cir. 2019).

The Haitian Humanitarian Parolees' testimony, which the Court finds to be credible, establishes that being denied a driver's license drastically affects Plaintiffs' ability to work and employment prospects in several critical ways. Several Plaintiffs wait hours before or after their scheduled shifts for rides from family members (who also work) (*see* Filing No. 39-3 at 13; Filing No. 39-4 at 7; Filing No. 39-5 at 6). This occurs for Mr. Meme "[a]ll the time," and, at least in one instance, he has had to wait "[t]hree, four hours." (Filing No. 39-3 at 13.) Mr. St-Hilaire repeatedly declines interpreter service engagements, which pay "significantly more" on a per-hour basis than his other employment, "because [he] was not able to obtain a ride to the assignment or to guarantee my ability to obtain a ride home" (Filing No. 39-6 at 2, 3). Though he would like to interpret as a career, it is "simply not possible to pursue this goal" without the ability to drive. *Id.* at 3. In his other job in residential and commercial electrical services, Mr. St-Hilaire faces the expectation that at some point he will be able to drive the work van himself, instead of requiring a "co-worker [to] drive 40 minutes to come to the workplace and take the van to the worksite" (Filing No. 39-2 at 14, 15). Furthermore, at least one Plaintiff, who graduated in 2018 with a four-year

medical nursing degree and owned her own business in Haiti, has testified that, "because of transportation issue[s] [she] can't" try to find a different job (Filing No. 39-4 at 5).

More generally, Plaintiffs are unable to fully participate in the activities of daily and personal life without a driver's license.  Persons on humanitarian parole "likely have a host of necessary appointments that other persons do not" — these include "obtain[ing] medical care that was unavailable in their country of origin," "meet[ing] with federal officials responsible for overseeing their parole status or request for asylum," and "meet[ing] with state officials responsible for determining their eligibility for public benefits."  (Filing No. 24-8 at 6.)  For example, Ms. Meme attends English school on Tuesdays and Thursdays, which is approximately thirty minutes away by car (Filing No. 39-4 at 7).  This burdens those who assist and drive her.  Moreover, Mr. St-Hilaire cannot regularly go to church service without a driver's license.  With the church twenty minutes from his residence, his attendance is limited to "[o]nly when [he] get[s] a ride" (Filing No. 39-2 at 8).  He only knows of one church family able to do so.

In light of the effects on employment, career prospects, and daily and personal life, the Court agrees that being denied a driver's license runs the risk of the Haitian Humanitarian Parolees "living a largely insular existence" in Indiana (Filing No. 24-8 at 6).  Accordingly, the Court finds that this constitutes irreparable harm because it would be "difficult — if not impossible — to reverse." *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011) (citing *Hollingsworth v. Perry*, 558 U.S. 183 (2010) (per curiam)).

The Commissioner argues that it is unclear that all putative class members suffer the same harm as the named plaintiffs, in part because "many parolees have viable paths" to "lawful status and a REAL ID" (Filing No. 37 at 38).  Disregarding that the certification sought is of a class limited to those parolees who, at present, "are *not eligible* for a driver's license or identification

card under section 202 of the REAL ID Act" (Filing No. 26 at 2) (emphasis added), it is clear that

Plaintiffs have introduced evidence that other putative class members are at current risk of the

same irreparable harms (*see generally* Filing No. 24-8), regardless of which potential paths (future

or current) to different immigrant statuses are available at a later date.   Ultimately, an equal-

protection claim, such as the one before the Court, is inherently a class-based claim — regardless

of formal certification, and the Seventh Circuit has made clear that

> [a]bsent the ability to grant injunctive relief that extends beyond the particular
> party, courts will have little ability to check the abuse of power that presents the
> most serious threat to the rule of law — such as that which is swift in
> implementation, *widespread in impact*, and *targeted toward those with the least
> ability to seek redress*.

*City of Chi. v. Barr*, 961 F.3d 882, 918 (7th Cir. 2020) (emphasis added).

The Court further disagrees with the Commissioner's proposition that the relief sought will

not benefit all class members, even those who "may not have access to vehicles" or "may not be

of legal driving age" still benefit from being able to obtain state-issued identification cards (Filing

No. 37 at 38).   Unlike "work authorizations issued to a noncitizen" or "foreign passports", which

are the forms of identification most often possessed by persons on humanitarian parole, Indiana-

issued identification cards are "well recognized throughout Indiana" and can assist Plaintiffs in

"opening bank accounts, cashing checks, [] entering government buildings, or [] a wide array of

other activities."  (Filing No. 24-8 at 7–8.)

In addition, "for some kinds of constitutional violations, irreparable harm is presumed."

*Ezell v. City of Chi.*, 651 F.3d 684, 699 (7th Cir. 2011).  The Seventh Circuit has explicitly held

that this presumption applies when one's First or Second Amendment rights are violated, since

they both protect "intangible and unquantifiable interests."   *Id.*   Several judges in this district,

including the undersigned, have concluded that this presumption also applies to equal protection

violations.  *See, e.g.*, *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 323 F. Supp. 3d 1030, 1040

(S.D. Ind. 2018); *Exodus*, 165 F. Supp. 3d at 738, *aff'd*, 838 F.3d 902; *Baskin v. Bogan*, 983 F.Supp.2d 1021, 1028 (S.D. Ind. 2014); *Planned Parenthood of Ind. and Ky. v. Comm'r, Ind. State Dep't of Health*, 984 F.Supp.2d 912, 930 (S.D. Ind. 2013); *L.P. v. Comm'r, Ind. State Dep't of Health*, 2011 WL 255807, *4 (S.D. Ind. Jan. 27, 2011). The Commissioner's citations to two Eleventh Circuit cases from over twenty years ago do not convince the Court that the state of the caselaw in this Circuit today is different (*see* Filing No. 37 at 38 (citing *Seigel v. LePore*, 234 F.3d 1163 (11th Cir. 2000); *No. Fla. Chapter of Ass'n of Gen. Contractors of Am. V. City of Jacksonville, Fla.*, 896 F.2d 1283 (11th Cir. 1990))).

The same conclusion of presumed irreparable harm is warranted here, as the basis for holding that violations of one's First and Second Amendment rights constitute irreparable harm apply equally to equal protection violations. As explained by the Seventh Circuit,

> [t]he loss of a First Amendment right is frequently presumed to cause irreparable harm based on the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if those rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future.

*Ezell*, 651 F.3d at 699. The same is true of the loss of Second Amendment rights, which "protect[] similarly intangible and unquantifiable interests." *Id.* If the Second Amendment right to possess a firearm for protection is "intangible and unquantifiable," certainly the right to not be subject to unconstitutional discrimination by the government is as well. *Cf. Back v. Carter*, 933 F.Supp. 738, 754 (N.D. Ind. 1996) ("[E]qual protection rights are so fundamental to our society that any violation of those rights causes irreparable harm.").

Moreover, when the Seventh Circuit has concluded that a constitutional violation does not cause irreparable harm, it is because the violation can be rectified by an award of damages. For example, a Fourth Amendment violation stemming from an illegal search or seizure does not presumptively cause irreparable harm because it is a "constitutional tort" analogous to a "personal-

injury" claim where money damages will be awarded.  *Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004).  Unlike Fourth Amendment violations that are akin to personal injury claims, the harm from unconstitutional discrimination is "intangible and unquantifiable," as governmental discrimination has consequences well beyond those that money could ever rectify.

In sum, the Haitian Humanitarian Parolees have shown a strong likelihood of success that H.E.A. 1050 constitutes unconstitutional discrimination in violation of the Equal Protection Clause.  Such an ongoing constitutional violation constitutes irreparable harm.  *See Preston v. Thompson*, 589 F.2d 300, 303 n. 3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm.").

## C.  **Balance of Harms**

The next question is whether the irreparable harm that the Haitian Humanitarian Parolees would endure without the protection of the preliminary injunction is greater than any irreparable harm the Commissioner would suffer if preliminary injunctive relief is granted.  *See Valencia v. City of Springfield, Ill.*, 883 F.3d 959, 966 (7th Cir. 2018).  That is, once a moving party has met its burden of establishing the threshold requirements for a preliminary injunction, the court must balance the harms faced by both parties and the public as a whole by "weigh[ing] the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor."  *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).  "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief."  *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (citation and internal quotation marks omitted).  "Stated another way, the district court 'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to

39

minimize the costs of being mistaken.'" *Id.* (quoting *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992)).

The Haitian Humanitarian Parolees' position regarding the balance of harms is straightforward: Plaintiffs will suffer irreparable harm, and the Commissioner, as a governmental entity, cannot claim that being required to comply with the Constitution is harmful. The Commissioner addresses the balance of harms and the public interest factors together, and he contends parolees remaining in the United States "[o]ver time" "naturally qualify for Real ID credentials as they achieve lawful status" (Filing No. 37 at 39), for which many parolees may already be eligible were they to apply for Temporary Protected Status or asylum.

As an initial matter, the Haitian Humanitarian Parolees have made a strong showing that they are likely to succeed on the merits of its equal protection claim. Therefore, the balance of harms need not strongly weigh in their favor for this factor to be met. The Plaintiffs have certainly met this relatively low threshold. They have demonstrated irreparable harm for the reasons discussed above.

The Commissioner's attempts to downplay these harms are unavailing. While some parolees may be lawfully admitted at a later time, that fact does not ameliorate the harms experienced by humanitarian parolees at present, nor does it render them nonexistent. Instead, the Commissioner's position of requiring Plaintiffs to apply for TPS or asylum, both of which are governed by detailed statutory requirements and are themselves lengthy processes,[8] weighs on

---

[8] At the time of this Order, the United States Citizenship and Immigration Services Case Processing estimates that it takes eight (8) months for 80% of initial TPS applications for Haiti to be completed. *See* Check Case Processing Times, U.S. Citizenship and Immigration Services, https://egov.uscis.gov/processing-times/ (last visited December 29, 2023) (select "I-821 Application for Temporary Protected Status" under "Form"; then select "Haiti Initial" under "Form Category"; then select "California Service Center" under "Field Office or Service Center"; then press "Get Processing Time"). Moreover, as of now, the average wait time in 2023 from court filing until asylum hearing was 1,243 days for Haitians and 1,429 days for all nationalities. Immigration Court Asylum Backlog, TRAC Immigration, https://trac.syr.edu/phptools/immigration/asylumbl/ (last visited December 29, 2023) (select "to Asylum Hearing"

balance in the Plaintiffs' favor and underscores the additional potential hurdles they would face were the injunction not granted.

The Commissioner has essentially presented no evidence that granting the Haitian Humanitarian Parolees a preliminary injunction will cause countervailing harms. "This is perhaps because it is difficult to conceive of how an injunction requiring it to comply with the Constitution could be harmful." *Exodus*, 165 F. Supp. 3d at 738 (quoting *Christian Legal Society v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006)), *aff'd*, 838 F.3d 902 (7th Cir. 2016).  To the extent the Commissioner contends that the relief sought would undermine Indiana's credential goals, very little demonstrates the state's professed ambition of becoming a "Real ID-only state" (Filing No. 37 at 11), beyond the initial passage of Sections 35, 47 and 50 of Public Law 184-2007, to which the Commissioner points, two years after Congress legislated Public Law 109-13 in 2005. (Filing No. 37 at 10.)

Further, very little demonstrates the state's efforts to achieve that goal.  As the Commissioner admits, Indiana law provides an exception to the Real ID requirement for U.S. citizens holding unexpired driver's licenses or identification cards on or before October 7, 2008 (*see* Filing No. 37-5 at 3 ¶ 11).  While 75% of credential holders in Indiana presently have Real ID compliant credentials, *see id.* at 7 ¶ 32, the state has no interest in restricting non-Real ID licenses and identifications, and the Commissioner does not explain or contextualize any harms that result from increasing the 25% of credential holders that lack them.  Nor does the Commissioner explain that changing the general goal and practice of the BMV would incur harms. By its own estimates, it has only issued 136 non-Real ID credentials since H.E.A. 1050 was signed

---

under "Average Days Pending since Court Filing"; then select "All-2024" under "Immigration Court State"; then select "All-2024" under "Immigration Court"; then select either "Haiti" or "All-2024" under "Nationality").

into law.  *See id.* at 6–7 paras 29, 30.  Accordingly, the impacts associated with increased foot traffic local BMV offices and employee time spent on increased applications appear negligible — as does the impact of issuing regulations that comply with the Constitution.  *See Walker*, 453 F.3d at 867.  During oral argument, the Commissioner alluded to the difficulty of clawing back licenses improvidently granted to parolees were the Court's injunction to be overturned.  In the Court's opinion, however, the BMV ably and regularly rescinds licenses in instances where licensees receive DUIs or state court restrictions on their ability to drive, therefore the Court does not credit this contention much, if any, weight.

In sum, the Court determines that the balance of equities weighs heavily in favor of granting an injunction for the Haitian Humanitarian Parolees.  An injunction prohibiting the implementation of the offending language in Section 17, H.E.A. 1050 will impose minimal, if any, additional harm or burdens on the Commissioner concerning their credentialing efforts.  On the other hand, not issuing an injunction and allowing the statute to be implemented as it exists today risks the imposition of significant harm on humanitarian parolees by depriving them of the privileges associated with non-Real ID driver's licenses, identification cards, and vehicle titles.  The Court does note, however, the Commissioner's reasonable request that the BMV be provided at least thirty days to comply with any issued injunction in order to implement the necessary changes and procedure and for training to take place, which the Court takes into consideration.

**D.**     **Public Interest**

The fourth and final preliminary injunction factor requires the Haitian Humanitarian Parolees to show that issuing an injunction is in the public interest.  Plaintiffs argue that it is always in the public interest for the state to follow federal law and eliminate discrimination.

The Commissioner argues that it is contrary to the public interest to impose the costs associated with bestowing the privileges in question prior to humanitarian parolees being lawfully admitted into the United States and given lawful status by the federal government.

Because the Haitian Humanitarian Parolees have some likelihood of success on the merits of constitutional claims, a preliminary injunction is in the public interest. *See Whole Woman's Health All. v. Hill*, 937 F.3d 864, 875 (7th Cir. 2019) ("Enforcing a constitutional right is in the public interest."); *Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) ("Surely, upholding constitutional rights serves the public interest.").  And because they have further shown that the balance of harms favors the injunction, these showings together weigh more heavily in the balance than the Commissioner's interest in enforcing a law that Plaintiffs have shown is likely unconstitutional. *See, e.g.*, *Preston*, 589 F.2d at 303 n. 3 ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest.").

**E.**     **Bond Requirement**

Federal Rule of Civil Procedure 65(c)'s bond requirement is waived. *See BankDirect Cap. Fin., LLC v. Cap. Premium Fin., Inc.*, 912 F.3d 1054, 1058 (7th Cir. 2019).  "There is no reason to require a bond" in a case in which "the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010).  Here, the Commissioner has not argued a likelihood of money damages, requested a bond, or otherwise responded to Plaintiffs' request that the preliminary injunction be issued without bond.  Any party may request an injunction bond while this case remains pending.

## F.    Scope of the Injunction

Haitian Humanitarian Parolees are therefore entitled to an injunction preventing the enforcement of the offending provision of Section 17 of H.E.A. 1050.  The Commissioner briefly argues that the Court cannot issue an injunction in favor of allowing all "persons on humanitarian parole" the requested relief; in essence, he is contending that any injunction must be limited to the named Plaintiffs (Filing No. 37 at 39).  The Commissioner relies on *Doe v. Rokita*, which identified "a problem with the remedy" when a court provides final relief enjoining a statute's application to non-parties without certifying a class action.  *Id.* (citing 54 F.4th 518, 519 (7th Cir. 2022)).  *Doe*, however, does not apply here because Plaintiffs seek a preliminary injunction while their motion for class certification remains pending.  (*See* Filing No. 9.)  Moreover, the Seventh Circuit has indicated that a district court's equitable powers can extend beyond the named parties, in an appropriate case.  *See Mulholland v. Marion Cnty. Elec. Bd.*, 746 F.3d 811, 819 (7th Cir. 2014) ("Facial unconstitutionality as to one means facial unconstitutionality as to all, regardless of the fact that the injunctive portion of the judgment directly adjudicated the dispute of only the parties before it.").  This Court is convinced that this is that case.  *See Barr*, 961 F.3d at 918.

## IV. CONCLUSION

For the reasons stated above, Haitian Humanitarian Parolees' Motion for Preliminary Injunction is **GRANTED** (Filing No. 8).  A separate injunction shall issue contemporaneously with this Order.  *See* Fed. R. Civ. P. 65(d).  The assigned Magistrate Judge is asked to enter a case management plan for resolving this case.

    **SO ORDERED.**

Date:  1/11/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Gavin Minor Rose
Stevie J. Pactor
Kenneth J. Falk
ACLU OF INDIANA
spactor@aclu-in.org
kfalk@aclu-in.org
grose@aclu-in.org

Tanya Broder
Nicholas David Espiritu
Chiraayu Gosrani
Lisa Graybill
NATIONAL IMMIGRATION LAW CENTER
broder@nilc.org
espiritu@nilc.org
gosrani@nilc.org
graybill@nilc.org

James A. Barta
Betsy M. DeNardi
OFFICE OF THE INDIANA ATTORNEY GENERAL
james.barta@atg.in.gov
betsy.denardi@atg.in.gov

William Bock, III
Adam R. Doerr
KROGER GARDIS & REGAS
wbock@kgrlaw.com
adoerr@kgrlaw.com